```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

          v.                             16 CV 3505 (WHP)


DEVON D. ARCHER, et al.,
                                         Conference
                Defendants.

------------------------------x
                                         New York, N.Y.
                                         August 18, 2016
                                         2:35 a.m.
Before:

               HON. WILLIAM H. PAULEY III,

                                         District Judge

                       APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
     Attorneys for Plaintiff
BY:  NANCY A. BROWN
     HOWARD GREGORY BAKER

BOIES, SCHILLER  FLEXNER LLP
     Attorneys for Defendant Devon Archer
BY:  MATTHEW L. SCHWARTZ
     BRET VALLACHER

SPERTUS, LANDES & UMHOFER
     Attorneys for Defendant Bevan T. Cooney
BY:  MATTHEW D. UMHOFER  (appearing telephonically)

WIAND GUERRA KING P.A.
     Attorneys for Defendant Gary T. Hirst
BY:  MATTHEW J. MUELLER (appearing telephonically)
```

```
 1                          APPEARANCES

 2    DILWORTH PAXSON LLP
           Attorneys for Movant Timothy B. Anderson
 3    BY:  LINDA DALE HOFFA

 4    ALSO PRESENT:  NEIL CHECKMAN, Esq.
                     DAVID TOUGER, Esq.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

G8IHSECC

1               (Case called)
2               THE DEPUTY CLERK:  This is SEC v. Archer, et al.
3     Appearances by the government.
4               MS. BROWN:  Nancy Brown, your Honor, from the SEC.
5     With me is my colleague Greg Baker.  Ms. Shah is on maternity
6     leave.
7               THE COURT:  All right.  Good afternoon, Ms. Brown.
8               THE DEPUTY CLERK:  For the movant, Timothy Anderson.
9               MS. HOFFA:  Yes, good afternoon.  Linda Dale Hoffa
10    with the Philadelphia law firm Dilworth Paxson.
11              THE COURT:  Good morning, Ms. Hoffa.
12              THE DEPUTY CLERK:  For defendant Archer.
13              MR. SCHWARTZ:  Good afternoon, Your Honor.  Matthew
14    Schwartz and Brett Vallacher for Devon Archer.
15              THE COURT:  Good afternoon to you, Mr. Schwartz.
16              THE DEPUTY CLERK:  For defendant Cooney.
17              MR. UMHOFER:  Good afternoon.  Matthew Umhofer for
18    Cooney by telephone.
19              THE COURT:  Good afternoon, Mr. Umhofer.
20              THE DEPUTY CLERK:  And for defendant Hirst.
21              MR. MUELLER:  Good afternoon.  Matthew Mueller by
22    telephone for Hirst.
23              THE COURT:  Good afternoon to you, Mr. Mueller.
24              All right.  This is an initial conference, and there
25    are several issues that have been raised.  Ms. Brown, you want

G8IHSECC

1    to begin by making a report.
2             MS. BROWN:  Sure, your Honor.  All of the defendants,
3    with the exception of Jason Galanis, have served their answers,
4    and most of them, I think, have been docketed.  We circulated a
5    proposed schedule for the exchange of the limited initial
6    disclosures that your Honor ordered and for the start of the
7    issuance of Rule 34 document requests and subpoenas, Rule 45
8    subpoenas, and a discovery cutoff, and we heard nothing from
9    any of the defendants on that proposed schedule.
10            We have also circulated a proposed confidentiality
11   stipulation and order, and we have heard from none of the
12   defendants on that.  I think before your Honor, if I could just
13   add this one thing, are several renewed motions by some of the
14   defendants for a full stay.  And that is the entirety of my
15   report.
16            THE COURT:  All right.  Let's begin, then, with the
17   issue relating to Mr. Anderson.  Do you want to be heard,
18   Ms. Hoffa?
19            MS. HOFFA:  Yes, your Honor.  I represent Timothy
20   Anderson.  He was formerly a partner with my firm, Dilworth
21   Paxson, and now he's with Dinsmore.  During his employment at
22   my firm, he was placement counsel in connection with the tribal
23   bonds that are at the heart of the allegations in the SEC
24   complaint.  We were served before the SEC filed their
25   complaint -- before the United States Attorney's Office filed

1    their complaint and warrant and subsequently their indictment,
2    we were served with -- I'm sorry, Mr. Anderson was served with
3    a subpoena duces tecum from the SEC, and we began to make this
4    production on a rolling basis.
5                We did a privilege review with regard to Burnham
6    Securities.  Burnham Securities was the firm's client.  They
7    were represented by Ariel Neuman, and Ariel communicated with
8    us and asserted privilege with regard to some, but with regard
9    to any communications for Jason Galanis or with regard to any
10   communications with regard to John Galanis, he made it quite
11   clear that he was not asserting any privilege; that they had
12   nothing to do with Burnham Securities.  And in an abundance of
13   caution --
14               THE COURT:  How did they get e-mail addresses for
15   Burnham Securities, then?
16               MS. HOFFA:  The e-mail -- there were different
17   e-mails, but there was e-mail with Jason Galanis that appeared
18   to be a Burnham e-mail.  I don't recall exactly what the
19   complete e-mail was, but it had Burnham in it.
20               THE COURT:  Is that a made-up e-mail?
21               MS. HOFFA:  It may have been.
22               THE COURT:  Ms. Brown, does the SEC know anything
23   about that?
24               MS. BROWN:  Yes.  We've seen those -- some of those
25   e-mails, and I think the address was Burnham Equity Partners,

1   if I'm not mistaken, which appears not to be a real Burnham
2   entity.
3            THE COURT:  All right.
4            MS. HOFFA:  So there was, obviously, some confusion.
5   But be that as it may, we gave the opportunity to Jason and to
6   John Galanis to, if they -- we communicated what we had heard
7   from Burnham Securities' counsel to them and said if they
8   want -- I'd written a letter and said, if you want to assert a
9   privilege, please tell us why, on what basis, and what
10  evidence.  And the response I got was not a response that I
11  expected back.  It said in that response, which is attached to
12  my letter, the privilege was being asserted with regard to an
13  entity called Thorsdale.  It was called -- sorry about this.
14  Thorsdale Fiduciary Duty and Guaranty Company Ltd.  And John
15  and Jason both asserted a privilege on behalf of this entity,
16  I'll call it Thorsdale, and the assertion of the privilege was
17  that Thorsdale is a beneficial owner of Burnham Financial
18  Group, which was the parent of Burnham Securities, and asserted
19  that privilege.
20           Now, with regard to that, your Honor, the firm had no
21  engagement letter with Thorsdale.  We've attached an exhibit of
22  what our engagement letter was, and that was with Burnham
23  Securities.  We've never done a conflicts check for Thorsdale.
24  And attorney Tim Anderson did not learn of this Thorsdale
25  entity or had ever heard of it until after the bond issues had

1  all closed.
2           So the point of the motion for the protective order is
3  this, your Honor:  We wanted an opportunity if the Galanises
4  were going to assert this privilege to have a forum in which
5  they could assert that privilege.  What happened after that, we
6  gave them the documents and a deadline.  I did this and said if
7  you're asserting the privilege, tell me on what documents and
8  again give me a detailed basis, and I never heard back
9  anything.
10          So Mr. Timothy Anderson, who did have dealings with
11 Jason Galanis in connection with the -- as placement counsel,
12 these are the reasons we did that, but the point is we do not
13 believe that they were a client of the firm or of Mr. Anderson
14 in connection with this.  But this really puts attorney
15 Anderson in a very -- in a rock and a hard place because
16 someone's asserting that he represented them and that there's a
17 privilege with regard these documents and Burnham Securities'
18 new counsel and the new entity -- is it new ownership?  I'm not
19 sure, but anyway, Ariel Neuman on behalf of counsel for Burnham
20 Securities is not asserting that privilege and being clear.
21          So it's almost like we're a placement holder, and we
22 were hoping that the Court could give us the protection so that
23 these issues could be aired and that decision could be made
24 that we turn over these documents because no privilege exists.
25          THE COURT:  All right.  Thank you.

1           Back in July this Court had issued an order inviting
2    any party who wished to make a submission on Mr. Anderson's
3    proposed protective order to do so by July 15.  As of today, I
4    haven't received anything.  Does anybody present in the
5    courtroom wish to be heard on the application?
6           MR. SCHWARTZ:  No, your Honor.
7           THE COURT:  All right.  I mean, it's unopposed.  Can
8    Dilworth Paxson resubmit the proposed order?
9           MS. HOFFA:  Yes, your Honor.
10          THE COURT:  All right.  I'll sign it.  Now, what about
11   several parties' interest in staying the entire action?  Who
12   wants to be heard on that?
13          MR. SCHWARTZ:  I'm happy to go first, your Honor.  On
14   behalf of Mr. Archer, largely for the same reasons we opposed
15   the U.S. Attorney's "limited stay," we would oppose a complete
16   stay.  Mr. Archer looks forward to defending himself in this
17   lawsuit.
18          THE COURT:  Any counsel wish to be heard?
19          MR. UMHOFER:  Your Honor, if -- on behalf of
20   Mr. Cooney, we're in line with Mr. Archer on behalf of
21   Mr. Cooney.
22          MR. MUELLER:  On behalf of Mr. Hirst, your Honor, we
23   are also aligned with the position of counsel for Mr. Archer.
24          THE COURT:  All right.  There are other counsel in the
25   courtroom who haven't appeared in the case but are known to the

G8IHSECC

1   Court generally when a case has a CR number as opposed to a CV
2   number.
3              So Mr. Checkman.
4              MR. CHECKMAN:  Yes, your Honor.
5              THE COURT:  What brings you to my door today?
6              MR. CHECKMAN:  Your Honor, I'd like to think of myself
7   as a rather large fly on the wall.  I represent Michelle Morton
8   on the parallel criminal action.  Ms. Morton, who I had
9   apprised of today's appearance, informed me both last night and
10  this morning that due to certain physical conditions she had,
11  she was unable to come here on doctor's orders.  So I'm
12  basically here to record and report back to her matters that
13  might concern her.  I have read her the papers that she
14  submitted as for her request for this Court for a full stay in
15  this particular matter, and her position was arrived at by
16  consultation with me.
17             I believe that right now she is in a very difficult
18  position, your Honor.  She is unrepresented at this particular
19  point in time by counsel on the civil case before the Court.
20  She has to defend against a rather complex case that's been
21  designated as a mega case by Judge Abrams in the criminal
22  matter.  That by asserting the Fifth Amendment in this
23  particular case, your Honor, she realizes that she has created
24  a presumption against herself that could cause her extreme
25  detriment in the civil action with the SEC and have

1    repercussions even if she is later on acquitted of the charges
2    in the criminal complaint.  And I think that the interest of
3    justice call out for a complete stay of this particular action
4    so that all parties can concentrate on the criminal action
5    where, of course, there's always a risk of incarceration.
6             It seems to me, your Honor, that there is little
7    chance that this case would get litigated at a trial prior to
8    the criminal case.  That being the case, your Honor, Ms. Morton
9    does not believe that there's any real prejudice to the parties
10   if we had a full stay in this particular matter.
11            And I could also apprise the Court of something else
12   that the Court may or may not know about.  About a week and a
13   half ago, I was contacted by counsel for Chubb Insurance, and
14   they informed me that they were going to have their own
15   attorney file a motion with this particular Court asking this
16   Court's direction as to whether they could offer directors and
17   officers insurance to Ms. Morton, which they are desirous of
18   doing.  If that was the case, your Honor, that would cover both
19   the criminal action and the civil action; and, therefore,
20   Ms. Morton would then be represented by counsel here as well as
21   there.  I think that, in the interest of justice, that that
22   would be the best scenario that could take place.
23            I have no idea about the timing.  I have no idea about
24   the possibility of success of that motion by Chubb.  All I do
25   know, your Honor, is that I do not see where there would be any

1   real detriment to the parties if this case was stayed,
2   especially in light of the fact that the Court has granted a
3   stay to the government so that large portions of this case have
4   been stayed.  It seems that to go forward on other portions of
5   this case without representation would severely disadvantage
6   Ms. Morton.
7            THE COURT:  All right.  Mr. Tougar.
8            MR. TOUGER:  Good to see you again.
9            THE COURT:  By the way, why don't you step up to the
10  podium also, because we have counsel who are participating by
11  telephone that they're probably better able to hear.
12           MR. TOUGER:  No problem, your Honor.  I'm here
13  basically for the same reason Mr. Checkman is; different
14  client, John Galanis.  I don't want to repeat what Mr. Checkman
15  said, but our positions are parallel.  The one thing I would
16  want to expound upon, your Honor, as far as judicial economy is
17  concerned, I would agree with Mr. Checkman and I'm sure the
18  Court would agree, that the criminal case is going to proceed
19  to trial much sooner than this civil case is.  I don't believe
20  the government's going to want to try the civil case before the
21  criminal case or if dispositions are made in the criminal case
22  till the civil case -- the civil case is not going to move
23  forward faster than that.  Therefore, it seems rather
24  counterproductive for this court, and I mean the Southern
25  District of New York, to be holding two parallel actions when

1    there's no doubt that the civil action, sooner or later, is
2    going to stop and wait for the criminal action to take place.
3            That being said, there's no reason for me to think
4    that we should start this civil action.  Mr. Galanis has filed
5    papers asking for the full stay.  Obviously, he does not want
6    to be presenting his Fifth Amendment rights on any questioning
7    or any demand for discovery; and, therefore, we would ask for a
8    full stay and just adding the reasons that Mr. Checkman's
9    already stated before the Court.
10           THE COURT:  All right.  Ms. Brown.
11           MS. BROWN:  The only thing I would add, your Honor,
12   typically we take no position.  That's the same position we're
13   taking today, but I would suggest that -- I haven't heard
14   Mr. Schwartz or counsel for Mr. Cooney or Mr. Hirst represent
15   that they plan to actually engage in discovery.  So what I
16   would hope doesn't happen is this becomes a one-way street
17   where we serve document requests, and the defendants all
18   uniformly assert an active production privilege.
19           I would also just point out that if the Court is
20   inclined at all to enter a full stay that the SEC be allowed to
21   issue Rule 45 subpoenas because of our very serious concern
22   about destruction of documents in the interim.  Burnham
23   Securities, I don't know how long they're going to be around.
24   They have filed an application to withdraw their broker-dealer
25   registration, and yesterday their counsel told me that he's no

1    longer retained by them.  So we have concerns about documents
2    disappearing before the civil case would resume.
3             THE COURT:  With the partial stay in place, what does
4    the SEC hope to accomplish?
5             MS. BROWN:  In terms of document discovery, your
6    Honor?
7             THE COURT:  In terms of discovery generally.
8             MS. BROWN:  Sure.  Well, as the Court knows from my
9    letter, I think, in July, with specific respect to Mr. Archer,
10   we still don't have complete discovery from him.  Our
11   investigation was -- he never responded to our subpoenas
12   completely.  And, in fact, the very scenario that Ms. Hoffa
13   just laid out with respect to the Dilworth Paxson firm
14   Mr. Archer has engineered with respect to the CKR law firm.
15   And so we had issued an administrative subpoena to procure
16   documents from CKR Law.  Mr. Weiss of CKR Law sent all of his
17   documents to various parties but primarily to Mr. Archer, and
18   we have yet to receive either a full production or a privilege
19   log to understand what the nature of the documents withheld
20   are.
21            THE COURT:  Do you intend to enforce these
22   administrative subpoenas that you've issued?
23            MS. BROWN:  I think what our current thought is, your
24   Honor, we would use this opportunity to engage in document
25   discovery to issue Rule 45 subpoenas once again to obtain that

1    material from, for example, CKR Law or the Dilworth Paxson
2    firm.
3             THE COURT:  Does anyone else want to be heard with
4    respect to this issue?
5             MR. SCHWARTZ:  On behalf of Mr. Archer, certainly we
6    would also be in favor of moving forward with the ability to
7    issue Rule 45 subpoenas.  It seems to me that there's an
8    intermediate solution here that solves both parties' concerns,
9    our able colleagues who gave the best pro se arguments I've
10   heard in a while, and everyone else's concerns, which is a
11   solution that is often adopted in this district when the U.S.
12   Attorney's Office obtains these sort of partial stays that they
13   have here.  Very frequently there is a corresponding mirror
14   stay of discovery as against the defendants so they are not put
15   in the position precisely that my colleagues have talked about
16   but the case can move forward.
17            Because I disagree very strongly that judicial economy
18   isn't served by moving this case forward.  This case was filed.
19   It was filed by the government against Mr. Archer and others.
20   And even if a criminal trial will happen before a civil trial,
21   that doesn't mean that we can't make progress here in the
22   interim.  And stopping everything now and requiring us to start
23   afresh a year or so down the line after a criminal trial is
24   completed is not in the interest of judicial economy.
25            So on behalf of Mr. Archer, our view is to the extent

1    that discovery can go forward, it ought to go forward.  We
2    would not object to a parallel stay as against the defendants.
3    I disagree with Ms. Brown that they are prejudiced if the
4    defendants assert their constitutional rights.  That's not a
5    prejudice in a civil case where they're going to argue that
6    they have a litigation benefit from that.  As your Honor
7    pointed out in your decision granting the partial stay, that's
8    a peril for the defendants.  And I can understand if for those
9    reasons you wanted to stay discovery against the defendants.  I
10   think that would be quite appropriate.  But if you didn't and
11   the defendants are prepared to navigate that choice, as we've
12   said we are, then that's not a prejudice to the SEC at all.
13            THE COURT:  Is the defendant -- if discovery continues
14   under a partial stay, is defendant Archer prepared to
15   participate in discovery?
16            MR. SCHWARTZ:  We're prepared to participate in
17   discovery to the extent that we will either respond to the
18   discovery request or we will, if appropriate, assert
19   Mr. Archer's constitutional rights.  That's a decision we can't
20   make until we see the discovery requests.
21            THE COURT:  What about, Ms. Brown, as Mr. Schwartz has
22   characterized it, a mirror stay for defendants Galanis and
23   Morton?
24            MS. BROWN:  I'm afraid I'm unfamiliar with the term
25   "mirror stay," your Honor.

G8IHSECC

1            THE COURT:  Meaning you couldn't take any discovery
2    against Galanis or Morton, and they wouldn't be taking any
3    discovery against -- to the SEC, but discovery could go forward
4    subject to the limitations I've previously fixed in the prior
5    order in the civil case.
6            MS. BROWN:  So that if Mr. Archer was to assert his
7    active production privilege, we would not have to respond to
8    his document request with documents; is that right?  Is that
9    the nature of the mirror stay?
10           THE COURT:  Well, we'll abide that event; okay?  I
11   don't know what Mr. Archer's going to do.  But if he exercises
12   his right and invokes his Fifth Amendment, I'm not going to
13   have a one-way street.  This will be 42nd Street not 41st
14   Street.
15           MS. BROWN:  Understood, your Honor.
16           THE COURT:  So you won't have to respond until you've
17   got a response.
18           MS. BROWN:  Terrific.  And may we proceed with Rule 45
19   subpoenas as I've suggested?
20           THE COURT:  That doesn't affect any of these other
21   people.  Of course, launch away with Rule 45.
22           MS. BROWN:  Thank you, your Honor.  What should we do
23   with the initial disclosures?  So your Honor ordered, if I can
24   remind you, the document description part of the initial
25   disclosures and presumably the damages part, which typically

1   doesn't really apply to us.  But should we set a date for
2   exchange of those?  That might give us an indication as to
3   whether the defendants are actually going to assert the
4   privilege.
5           THE COURT:  Right, or whether this is all just
6   strategery, as a former president used to say.
7           So, Mr. Schwartz and Mr. Umhofer and Mr. Mueller, when
8   do you want to agree on a date for initial disclosures?
9           MR. SCHWARTZ:  I have no objection to the date that
10  was proposed by Ms. Brown, which is the 25th of this month.
11          But I want to go back to something Ms. Brown said and
12  something your Honor seemed to agree with, which I don't think
13  is right, which is you will wait to see if the defendants
14  assert their constitutional rights, and if they do, the SEC
15  won't have to produce anything.  That would be a one-way street
16  in the other direction because the SEC would certainly take the
17  view that they're entitled to an adverse inference from that
18  implication.  That would be wrong, but I think that they would
19  take that view.
20          THE COURT:  But at that point I would just drop the
21  curtain on this whole case and put it in the freezer.
22          MR. SCHWARTZ:  And do that --
23          THE COURT:  That's all.  I'm giving you the chance
24  to -- I'm calling your bluff, in essence, and I'm giving you
25  the chance to drive the bus by responding appropriately to

1    discovery; and if not, if, as is everyone's right, they

2    exercise their right, I'm not going to continue the proceeding.

3    I'm going to put the whole thing in the ice box until the

4    criminal case is over.

5             But in the meantime, the government can serve Rule 45

6    subpoenas if they want, and those Rule 45 subpoenas involve

7    nonparties not subject to Fifth Amendment issues.  I'll handle

8    those discovery disputes even if I put the case in the ice box.

9             MR. SCHWARTZ:  I think I understand you.  Two

10   questions, your Honor.  One, I assume all parties will have the

11   ability to issue Rule 45 subpoenas?

12            THE COURT:  Absolutely.

13            MR. SCHWARTZ:  Two, I appreciate your comment that if

14   the defendants invoke their rights, you'll shut down the entire

15   action, at least aside from Rule 45 subpoenas.  Is it

16   understood that, in the event the parties invoke, that won't be

17   used against us?  Because otherwise, otherwise requiring us to

18   invoke first prejudices the defendants.

19            THE COURT:  We will abide the event of your invocation

20   and my putting it in the ice box.  Because think about it, what

21   will happen?  Either your client will be convicted in the

22   criminal case, and then it won't matter one whit that you

23   invoked, or your client will be acquitted in that case, and

24   then I will expunge the invocation of the Fifth.

25            MR. SCHWARTZ:  That was my question.  Thank you.

1   Thank you, your Honor.
2              THE COURT:  No, they won't have the binominal leg up
3   if your client gets acquitted.
4              MR. SCHWARTZ:  That was my question.
5              THE COURT:  That would be unfair.
6              MR. SCHWARTZ:  I agree with you.  That was my point.
7   Thank you.
8              THE COURT:  Okay.  Let's see if we've resolved all of
9   this.  Dilworth Paxson is going to resubmit the protective
10  order.
11             MS. HOFFA:  Yes, your Honor.
12             THE COURT:  All right.  And I'm going to enter a short
13  order that will probably more clearly state the contour of the
14  mirror stay here and authorize the service of Rule 45
15  subpoenas.
16             Is there anything else that we can accomplish today?
17  And we have the initial disclosures by August 25.  Anything
18  else?
19             MS. BROWN:  Not from us, your Honor.  Thank you.
20             MR. SCHWARTZ:  No, your Honor.
21             THE COURT:  Everybody's bucket list was satisfied.
22  That's good.
23             MR. TOUGER:  Thank you, your Honor.
24             THE COURT:  Have a good afternoon everyone.
25             (Adjourned)