ANDREW M. CALAMARI
REGIONAL DIRECTOR
Sanjay Wadhwa
Nancy A. Brown
Tejal D. Shah
H. Gregory Baker
Adam S. Grace
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION, :
:
    Plaintiff, :  16 Civ. 3505 (WHP)
:
            v. :  ECF Case
:
DEVON D. ARCHER, BEVAN T. COONEY, :  AMENDED COMPLAINT
HUGH DUNKERLEY, JASON W. GALANIS, :  AND JURY DEMAND
JOHN P. GALANIS, GARY T. HIRST, :
MICHELLE A. MORTON and :
FRANCISCO MARTIN, :
:
    Defendants. :

------------------------------------------------------------- x

        Plaintiff Securities and Exchange Commission ("Commission"), for its Amended

Complaint against Defendants Devon D. Archer ("Archer"), Bevan T. Cooney ("Cooney"),

Hugh Dunkerley ("Dunkerley"), Jason W. Galanis ("Jason Galanis"), John P. Galanis ("John

Galanis"), Gary T. Hirst ("Hirst"), Michelle A. Morton ("Morton"), and Francisco Martin (also

known as Francisco Martin Fernandez) ("Martin") (together, the "Defendants"), alleges as

follows:

## SUMMARY OF THE ALLEGATIONS

1.      This case involves a fraudulent scheme orchestrated by Jason Galanis to obtain undisclosed control over two registered investment advisers so that over $43 million of their clients' funds could be invested in sham Native American tribal bonds (hereinafter, the "bonds" or "Tribal Bonds"), and ultimately diverted to him and his associates and the entities they controlled at the expense of unwitting investors.

2.      To carry out the Tribal Bond scheme, Jason Galanis enlisted his father (John Galanis) and six of his associates, Archer, Cooney, Dunkerley, Hirst, Morton, and Martin.  As Jason Galanis told Cooney and Archer prior to the first issuance of the Tribal Bonds, the "primary objective" was "to get us a source of discretionary liquidity" – liquidity Jason Galanis would use to fund his and his father's lavish lifestyles, and to expand the corporate empire in which he, Archer and Cooney had invested.  Jason Galanis brought on Hirst, Dunkerley, Morton and Martin as needed, and compensated them for the roles they knowingly assumed as front men and facilitators.

3.      Jason Galanis and John Galanis kicked off the scheme in March 2014, when they convinced a Native American tribal corporation, the Wakpamni Lake Community Corporation, affiliated with the Wakpamni District of the Oglala Sioux Nation, whose members live in one of the poorest regions in the United States (the "WLCC"), to become the issuer of the limited recourse bonds that they had already structured and developed.  From August 2014 to April 2015, Jason Galanis and John Galanis arranged for WLCC to issue three tranches of Tribal Bonds.

4.      Having secured an issuer, Jason Galanis and his associates needed investors to buy the Tribal Bonds, and they found them in the unsuspecting clients of two investment

advisers over which Jason Galanis and his associates gained control.  In July 2014, Jason Galanis arranged the purchase of investment adviser Hughes Capital Management, LLC ("Hughes") – which managed approximately $900 million for various pension funds – and installed Morton as CEO and part owner.  And, in April 2015, Jason Galanis arranged for Hughes to acquire another investment adviser with still more pension fund clients' funds under management, Atlantic Asset Management LLC ("AAM"), and put Morton in charge of the larger enterprise.  Jason Galanis arranged for Valor Group Ltd. ("Valor Group"), an entity controlled by Jason Galanis, Archer, Dunkerley and others, to provide the financing for both purchases through its wholly-owned insurance company subsidiaries Wealth-Assurance AG ("Wealth-Assurance") and Valorlife Lebensversicherungs AG ("Valorlife"), informing Archer and Cooney that this acquisition promised greater "liquidity" for "their various projects."

5.       Morton understood that Valor Group's financing of both acquisitions was contingent on her agreement to invest Hughes' and AAM's clients' funds in the Tribal Bonds.  In August 2014, at the direction of Jason Galanis, Morton hired Hirst at Hughes and authorized Hirst to purchase $27 million of Tribal Bonds on behalf of nine Hughes clients.  In April 2015, again at the direction of Jason Galanis, Morton used $16.2 million of an AAM client's funds to buy Tribal Bonds.

6.       According to the trust indentures and other documents relating to the Tribal Bond issuances, the proceeds from each issuance were primarily to be invested in an annuity to benefit WLCC and generate sufficient income to pay interest, and ultimately to repay the principal, to the bond holders.  In connection with each bond issuance, WLCC entered into an annuity contract with Wealth Assurance Private Client Corporation ("WAPCC"), an entity described in a private placement memorandum as a subsidiary of Valor Group.  Pursuant to each annuity

contract, the bond proceeds were to be managed by an independent investment manager, Private Equity Management LLC ("PEM"), in a separately managed account at WAPCC.

7.      However, PEM was a fake entity created at the behest of Jason Galanis solely to act as a conduit of the proceeds from the bond issuance to Jason Galanis and his associates. Jason Galanis paid Martin $150,000 to sign the annuity contracts as the purported "Managing Director" or "Portfolio Manager" of PEM, but Martin never provided any investment management services.  Instead, Jason Galanis gained undisclosed control over the bond proceeds, and he and the other Defendants used the proceeds for their personal benefit, including to purchase luxury goods, pay the criminal defense costs of John Galanis and Jason Galanis in a previously charged case, boost the net capital of two broker-dealers in which Archer and Cooney had interests, and finance the initial public offering of "Technology Company," a corporation in which Jason Galanis, Hirst, Cooney, Dunkerley and Archer held shares, and for which Jason Galanis served as an "advisor."

8.      In September 2015, Jason Galanis, John Galanis and Hirst were charged both by the Commission and by a grand jury convened by the United States Attorney's Office for the Southern District of New York ("USAO") with securities fraud arising out of a different and unrelated scheme.  SEC v. Galanis, et. al., 15 Civ. 7547 (VSB) (S.D.N.Y.) ("SEC v. Galanis"); and United States v. Jason Galanis, et al., 15 Cr. 0643 (PKC) (S.D.N.Y.) ("US v. Galanis"). Jason Galanis pled guilty to two counts of conspiracy to commit securities fraud, and one count each of securities fraud and investment adviser fraud.  John Galanis pled guilty to one count each of conspiracy to commit securities fraud and securities fraud.  Hirst was convicted after a jury trial of one count each of conspiracy to commit securities fraud, securities fraud, conspiracy to commit wire fraud, and wire fraud.

9.      While free on bail, Jason Galanis continued to further the fraudulent scheme described herein by, among other things, orchestrating payments to the Tribal Bond indenture trustee to fund the Tribal Bonds' interest payment obligations as they came due.

## VIOLATIONS

10.     By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

11.     Jason Galanis violated:

- Sections 17(a)(l) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(l) and (3)]; and,

- Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

12.     Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin violated:

- Sections 17(a)(l) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(l) and (3)], or, in the alternative, Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], by aiding and abetting Jason Galanis's violations of Sections 17(a)(l) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) an (3)]; and,

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], or, in the alternative, Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Jason Galanis's violations of Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

13.  Morton violated:

- Section 10(b) of the Exchange Act  [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)];

- Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and,

- Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)] by aiding and abetting Hughes' and AAM's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)] and aiding and abetting AAM's violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## JURISDICTION AND VENUE

14.  The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking a final judgment: (a) restraining and permanently enjoining each of the Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering each of the Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; (c) prohibiting Jason Galanis, Archer and Dunkerley from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Jason Galanis, Archer, Dunkerley and Morton from

acting as an officer or director of a public company pursuant to Section 21(d)(2) of the

Exchange Act [15 U.S.C. § 78u(d)(2)]; and (d) imposing civil money penalties on Jason Galanis,

Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)]; on Jason Galanis, Archer, Cooney, Dunkerley, John Galanis,

Hirst, Morton and Martin pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)], and on Morton pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-

9(e)].

   15. This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Section 22(a) of the Securities Act [15. U.S.C. § 77v(a)] , Sections 21(d) and 27 of

the Exchange Act [15. U.S .C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15

U.S.C. § 80b-14]. The Defendants, directly or indirectly, made use of the means or instruments

of transportation or communication in interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the transactions, acts, practices, or courses of

business alleged herein, certain of which occurred in this District. For example, Burnham

Securities Inc. ("Burnham Securities"), the placement agent for the sale of the Tribal Bonds, is

located in New York, New York.

## DEFENDANTS

   16. **Jason Galanis**, age 45, resides in Los Angeles, California. Jason Galanis was the

subject of a prior Commission enforcement action, SEC v. Penthouse Int'l, Inc., et al., 05 Civ.

0780 (S.D.N.Y.), for engaging in accounting fraud and financial reporting violations. On April

27, 2007, pursuant to a settlement with the Commission, he was enjoined from violating Sections

10(b) and 15(d) of the Exchange Act, including Rule 10b-5, and was barred from serving as an

officer and director of a public company for a period of five years, a bar which expired in 2012.

In September 2015, Jason Galanis was sued by the Commission and indicted by a grand jury convened by the USAO, based on allegations that he orchestrated a fraudulent and unregistered public distribution of millions of dollars of shares of a publicly traded company, Gerova Financial Group, Ltd. ("Gerova"). See SEC v. Galanis; US v. Galanis. He has since pled guilty to various securities laws violations in US v. Galanis and is incarcerated pending his sentencing in that matter.

17.     **John Galanis**, age 73, resides in Oceanside, California. John Galanis is the father of Jason Galanis, and has been the subject of numerous prior criminal proceedings, as well as enforcement actions by the Commission, dating back to the late 1960s. Most recently, John Galanis was charged by the SEC and USAO for his alleged involvement in the Gerova scheme. See SEC v. Galanis; US v. Galanis. Like his son, Jason, John Galanis pled guilty to various securities-related violations in US v. Galanis, and awaits sentencing.

18.     **Archer**, age 42, resides in Brooklyn, New York. Archer was, at times relevant herein, a director, officer and direct or indirect owner of and/or investor in various entities connected to the Tribal Bond scheme including Valor Group, Valorlife, COR Fund Advisors LLC ("CORFA"), Burnham Financial Group, the holding company for broker-dealer Burnham Securities, BAM Holdings, LLC, the holding company for investment management companies operating under the Burnham name, including Burnham Asset Management Corporation ("BAM"), Rosemont Seneca Bohai LLC ("RSB"), a Delaware limited liability corporation that he wholly owns, and BOE Capital, LLC, a Delaware limited liability corporation that he wholly owned as of August 12, 2014.

19.     **Cooney,** age 43, resides in Incline Village, Nevada. Jason Galanis has described Cooney as his "best friend of 23 years and equity holder in all the businesses." At all relevant

times herein, Cooney was a direct or indirect owner of CORFA, through which he owned an interest in Burnham Securities.

20.   **Dunkerley,** age 41, resides in Irvine, California.  At relevant times herein, he served as the Director, President, Executive Vice President and Secretary of Valor Group, Director of Wealth-Assurance, Director of Valorlife and a Managing Director of Burnham Securities.  He is currently Sole Director and President of WAPCC and Managing Member of BFG Socially Responsible Investing Limited ("BFG Investments"), having been installed in each of these management positions by Jason Galanis.  At all relevant times, Dunkerley acted at the direction of Jason Galanis or with his knowledge.

21.   **Hirst,** age 63, resides in Lake Mary, Florida, but is currently incarcerated pending his sentencing in US v. Galanis.  He served as Hughes' Chief Investment Officer ("CIO") in August 2014 and directed the investment of over $27 million of Hughes' clients' funds in Tribal Bonds.  Hirst is the Assistant Secretary of WAPCC and signatory on its bank account.  In September 2015, Hirst was charged by the Commission and the USAO along with Jason Galanis and John Galanis in connection with the Gerova scheme.  See SEC v. Galanis; US v. Galanis. On September 28, 2016, a jury convicted Hirst of various securities-related violations in US v. Galanis.

22.   **Morton**, age 55, resides in Colonia, New Jersey.  She served as the CEO of Hughes and AAM, and owned an interest in Hughes' and AAM's parent company, GMT Duncan LLC ("GMT").  In her capacity as CEO of Hughes and AAM, Morton oversaw the investment of over $43 million of client funds in Tribal Bonds.

23.   **Martin**, age 42, resides in Woodland Hills, California.  Until June 2016, Martin was the sole owner and CCO of Malaga Asset Management, LLC, an SEC-registered investment

adviser.  At times relevant herein, Martin held himself out as Portfolio Manager and/or Managing Director of PEM.

### OTHER RELEVANT ENTITIES

24.     **Burnham Securities**, an SEC-registered broker dealer based in New York, New York, served as the placement agent for the Tribal Bonds.  At all relevant times, Burnham Securities was wholly owned by **Burnham Financial Group**.  Beginning in 2014, Jason Galanis, Archer and Cooney gained control of Burnham Financial Group and Burnham Securities, through, at least in part, **CORFA**, a Delaware limited liability company in which Jason Galanis, Archer and Cooney held direct or indirect ownership interests at relevant times herein.

25.     **WAPCC** was incorporated by Dunkerley in the British Virgin Islands and was purportedly the annuity provider in connection with the Tribal Bonds.  Dunkerley also incorporated a company called WAPCC in Florida and opened an associated bank account (the "WAPCC Account") for which he and Hirst are the only signatories, and to which the net Tribal Bond proceeds were sent by the Indenture trustee.

26.     **Valor Group** was incorporated as Wealth Assurance Holdings Ltd. by Dunkerley in the British Virgin Islands in 2013, and changed its name to Valor Group Ltd. in December 2014.  Through **Thorsdale Fiduciary and Guaranty Company Ltd. ("Thorsdale")**, a Nevada incorporated family trust company Jason Galanis controls, Jason Galanis holds a significant ownership interest in Wealth Assurance Holdings Ltd., and its successor, Valor Group.  In 2013, Wealth Assurance Holdings Ltd.  purchased **Wealth-Assurance**, and Dunkerley was appointed to Wealth-Assurance's Board of Directors.  In November 2014, Wealth Assurance Holdings Ltd. acquired **Valorlife**.  Jason Galanis became a paid advisor to Valorlife's Board of Directors in

December 2014. Wealth-Assurance provided the financing for GMT's purchase of Hughes, and Valorlife provided the financing for GMT's purchase of AAM. In addition, Wealth-Assurance's subsidiary, **BFG Investment**s, became an indirect owner of Hughes and AAM by virtue of an ownership interest it acquired in GMT.

27.    **AAM** is an SEC-registered investment adviser which was principally located in Stamford, Connecticut. In April 2015, AAM was purchased by GMT and merged with **Hughe**s, an SEC-registered investment adviser, which was principally located in Alexandria, Virginia. The merged entity retained AAM's name. AAM was charged by the Commission in connection with its investment of client funds in the Tribal Bonds in December 2015 and is now in receivership and in the process of winding down. See SEC v. AAM, 15 Civ. 9764 (WHP) (S.D.N.Y).

28.    **PEM** was a company set up by Martin and purportedly domiciled in the British Virgin Islands. Martin acted as its Managing Director and Portfolio Manager. Martin signed the Investment Management agreement with WLCC on behalf of PEM for each of the tranches of Tribal Bond issuances described below, even though he understood that neither he nor PEM would have any role for carrying out the functions assigned to him in the agreement. The Investment Management agreement designated PEM as the independent Investment Manager for the Tribal Bond proceeds and gave it the authority to direct the investment of the proceeds pursuant to certain stated investment guidelines.

## FACTS

29.    The Tribal Bond scheme orchestrated by Jason Galanis consisted of four parts: 1) pitching WLCC to issue the Tribal Bonds; 2) engineering the Tribal Bond issuances to give Jason Galanis and his associates undisclosed control over the Tribal Bond proceeds; 3) securing

victims to purchase the Tribal Bonds; and 4) misappropriating the Tribal Bond proceeds for the
benefit of Jason Galanis and his associates, including the Defendants.

30.     E-mails among Jason Galanis, Archer and Cooney reflect their intent, from the
outset of the scheme, to control and use the proceeds from the Tribal Bonds for their personal
benefit. In April 2014, when an initial issuance of $20 million bonds appeared imminent, Jason
Galanis e-mailed Archer and Cooney: "$20 mm bond approved. Proceeds are $15 mm to us and
5 mm to them." In July 2014, after WLCC had approved issuing the bonds, Jason Galanis e-
mailed Archer and Cooney: "My primary objective is to get us a source of discretionary
liquidity. Sick of begging."

A.   The Pitch: John Galanis Finds a Bond Issuer.

31.     John Galanis handled the initial efforts to find a bond issuer for the scheme. In or
about March 2014, John Galanis attended a Native American economic development conference
in Las Vegas, Nevada and made a presentation to several tribes regarding a prospective Native
American bond issuance. John Galanis purported to be representing Burnham Securities, even
though he had no official connection to Burnham Securities.

32.     John Galanis's presentation to prospective Native American bond issuers had all
the necessary players (except the issuer) in place, including Burnham Securities as the Placement
Agent. During the conference, a representative of WLCC indicated to John Galanis that WLCC
would be interested in participating in the issuance. John Galanis was WLCC's primary point of
contact regarding the Tribal Bonds throughout the scheme and induced WLCC to issue each
tranche of Tribal Bonds.

**B.  The Tribal Bonds Are Structured to Allow Jason Galanis and Dunkerley to
Control the Bond Proceeds.**

33.    Jason Galanis and John Galanis arranged for WLCC to issue three tranches of
Tribal Bonds:  a) $27,077,436 in August 2014; b) $20,000,000 in September 2014; and c)
$16,200,000 in April 2015.  The first and last issuances defrauded investment adviser clients of
Hughes and AAM.  The middle issuance did not represent an additional capital raising event;
instead, bond proceeds from the first issuance were used to purchase newly issued Tribal Bonds,
so that Jason Galanis, Archer, Cooney and Dunkerley could obtain $20 million worth of bonds
for their own use without any capital outlay on their part.

34.    To Jason Galanis, the Tribal Bonds were simply a source of cash, providing him
with the liquidity he needed to expand the corporate empire he sought to assemble with Archer,
Cooney and Dunkerley.  In one revealing email to Archer and Cooney from August 2014, Jason
Galanis proposed an acquisition of a European fund of funds – brought to him by Dunkerley –
and identified the source of funds for the acquisition as proceeds from a Tribal Bond issuance.
After describing the deal, Jason Galanis wrote:  "Hugh [Dunkerley] [has] locked it up and came
to me for the money, which i have agreed to arrange/provide (probably Indians)."

35.    Each Tribal Bond issuance was governed by an indenture that provided for the
vast majority of proceeds to be invested in an annuity that was supposed to generate income
sufficient to pay interest to the bond investors, plus a smaller annual sum to WLCC for use in
various development projects.  The interest payments and ultimate repayment of the principal of
the bond issuance depended on the success of the investments held by the annuity in which the
proceeds of the issuances were to be invested.

36.   In June 2014, Burnham Securities' counsel provided WLCC with a summary of the bond program that listed Wealth-Assurance as the Annuity Issuer and PEM as the Portfolio Manager.

37.   In May 2013, Jason Galanis had arranged Valor Group's purchase of Wealth-Assurance, purportedly a Liechtenstein-based life insurance and annuity provider with €1.5 billion in assets under management, and soon after installed Dunkerley on its Board of Directors. Ultimately, Wealth-Assurance never provided any annuity contracts in connection with any of the bond issuances.

38.   In August 2014, when WLCC issued its first bonds, PEM nominally became the independent investment manager for the bond proceeds. The trust indenture and a separate investment management agreement with WLCC tasked PEM with selecting an annuity provider and placing the bond proceeds in a variable annuity. Martin signed the investment management agreement on behalf of PEM as its Managing Director.

39.   However, Martin was not an independent investment manager but simply a shill for Jason Galanis. In return for a $150,000 fee (ultimately paid to him out of bond proceeds that were supposed to be invested in the annuity), Martin agreed to act on behalf of PEM in signing the Investment Management Agreement with WLCC with full knowledge that he would perform none of the investment management duties set out in the contract.

40.   Although the annuity contract named PEM as the independent manager of the monies held by the annuity provider in a separately managed account, Martin exercised no authority over any such account and made no investment decisions regarding the funds. In signing the annuity contract with WAPCC, Martin knew, or was reckless in not knowing, that he

14

was funneling the bond proceeds directly to the control of Jason Galanis and his associates and entities.

41.     The annuity provider was not chosen by Martin, but by Jason Galanis.  Instead of selecting Wealth-Assurance, Jason Galanis selected WAPCC.  The annuity contract between WLCC, WAPCC and PEM, by Martin, identifies WAPCC as a British Virgin Islands ("BVI")- incorporated entity that is "part of the Wealth-Assurance Group of companies."

42.     In fact, Dunkerley is the sole shareholder of WAPCC and it has no known affiliation with Wealth-Assurance.  At Jason Galanis's instruction, or with his knowledge, Dunkerley incorporated WAPCC in the BVI on August 22, 2014, just four days before Jason Galanis selected WAPCC as the annuity provider for the first issuance of the Tribal Bonds. WAPCC's unaudited financial statements reflect that through the end of December 2014, WLCC was WAPCC's only annuity "counterparty."

43.     Also contrary to the annuity contract between WAPCC, WLCC and PEM, the bond proceeds were not directed to a WAPCC account at a bank "without any offices and/or branches in the United States."  Instead, the indenture trustee was instructed to send the bond proceeds to a bank account at a Florida branch of a US bank, in the name of an identically named company that had been incorporated in Florida on July 7, 2014.

44.     In its Florida incorporation papers, WAPCC listed Dunkerley as its sole officer, and gave its mailing address as a post office box in Florida used by Hirst.  As described below, the misappropriation of the bond proceeds all flowed from the WAPCC Account associated with WAPCC in Florida.

**C. Jason Galanis Secures Victims to Purchase the Tribal Bonds by Obtaining Control over Hughes and AAM.**

45.     In order to secure victims to purchase the Tribal Bonds, Jason Galanis and his associates arranged to obtain control over two investment advisers, thereby gaining access to captive client funds.  First, in August 2014, Jason Galanis, Archer, Cooney and Dunkerley obtained control over Hughes, and Jason Galanis, Morton and Hirst arranged for Hughes to invest $27 million of its clients' funds in Tribal Bonds.  Second, in April 2015, Jason Galanis, Archer, Cooney and Dunkerley obtained control over AAM, and Jason Galanis and Morton arranged for AAM to invest $16.2 million of its clients' funds in Tribal Bonds.

### 1.     Hughes

46.     In May 2014, Jason Galanis was introduced to Morton, the half-owner of GMT, which had the stated business purpose of providing socially responsible fixed income investment management and advisory services as a minority business enterprise.  Together, Jason Galanis and Morton began negotiating to purchase Hughes, an investment adviser with approximately $900 million under management, based in Alexandria, Virginia.

47.     On June 3, 2014, Jason Galanis provided Morton with a document to provide to Hughes' then-owner to "demonstrate who [Morton's] financial sponsors are."  The document described a private equity control investor that owned several businesses, including Wealth-Assurance and Burnham Securities.  On June 5, 2014, Jason Galanis sent Morton a term sheet outlining the terms by which CORFA – a corporation owned in part by Jason Galanis, Archer and Cooney – would directly or indirectly (through a subsidiary) finance GMT's purchase of Hughes.  Archer and Cooney knew that their agreement to finance the Hughes' acquisition with CORFA funds was a necessary part of the plan to place the Tribal Bonds and obtain "liquidity" for themselves and their corporate expansion projects.

16

48.     Jason Galanis kept Archer and Cooney in the loop regarding the negotiations to acquire Hughes.  On July 16, 2014, he sent them a copy of the executed term sheet for the acquisition of Hughes.  He proclaimed: "I believe they will take $28 million of the [Tribal] issue."  Cooney and Archer expressed their enthusiasm, with Cooney replying: "West Coast Offense charging down the field!"  Archer added: "This is very encouraging!"

49.     On August 1, 2014, Jason Galanis sent Morton a text message stating that he would form BFG Investments – the entity through which the contribution to the acquisition would be made – the next day.  On August 5, 2014, at the direction of Jason Galanis, Dunkerley formed BFG Investments and became its managing member.

50.     One week later, GMT entered into an amended and restated operating agreement with its members, pursuant to which BFG Investments became a "Preferred Member."  The agreement was signed by Dunkerley on behalf of BFG Investments, and stated that notices to BFG Investments were to be sent to Archer.  After the merger closed, Hughes became GMT's subsidiary and Morton and her business partner became officers of Hughes.

51.     On August 12, 2014, Jason Galanis arranged for Wealth-Assurance to fund BFG Investments' initial capital contribution of $2,660,618 to GMT, which GMT used to finance its purchase of Hughes.

52.     As Morton knew, Jason Galanis, Archer, Cooney and Dunkerley's agreement to finance the acquisition of Hughes was contingent on her agreement to invest Hughes' client funds in Tribal Bonds.  In July 2014, even before the purchase of Hughes had been completed, Morton e-mailed Jason Galanis "an update on how we will place the bonds in a portfolio" and promised him via text message, "I will make sure you make a TON of money and smile all the way to the bank."  On August 12, 2014, Morton sent Jason Galanis a text message noting, "You

invested because of the bonds not me," to which he responded: "The bonds are only possible because of you my dear."

53.     Pursuant to GMT's amended operating agreement, BFG Investments was accorded certain privileges, including the right to approve the CIO for GMT and Hughes, and to appoint members to Hughes' board.

54.     Before GMT completed its purchase of Hughes, Jason Galanis introduced Morton to Hirst as a potential CIO.  On August 12, 2014, Hirst sent Morton a draft employment contract. Hirst and Morton executed the contract and related paperwork that same day.

55.     However, a few days later, Hirst informed Morton that he did not want Hughes to disclose his name in its Form ADV, a form that investment advisers registered with the Commission are required to file upon registration and annually thereafter.  For that reason, Hirst decided to resign as Hughes' CIO and agreed to act as a paid independent investment consultant instead, a position that he understood would not require disclosure on Hughes' Form ADV.  As Morton told Jason Galanis, "In regard to Hirst, he opted to be a consultant because as an employee he would have been required to make certain disclosures for our ADV. . . If we want to follow the contract which has him as CIO its [sic] no problem, we just have to change the title, but he has to make the disclosures per regulations."

56.     By August 14, 2014, just two days after the purchase of Hughes was completed, Jason Galanis and Hirst worked to invest Hughes client funds in the Tribal Bonds.  Hirst quickly undertook an analysis of Hughes' clients' accounts and investments to determine what could be liquidated to generate funds to purchase Tribal Bonds.

57.     Morton asked Hughes' compliance officer to conduct an analysis of the investment guidelines of seven of Hughes' clients to determine whether they allowed for

18

purchase of the Tribal Bonds. The compliance officer concluded that most of the clients' guidelines prohibited privately-placed, unrated bonds like the Tribal Bonds, and that in no case could the investment be made without consulting the client first.

58. On August 17, 2014, Jason Galanis, using a Burnham-affiliated e-mail address (burnhamequitypartners.com), e-mailed Morton a copy of the draft trust indenture for the Tribal Bonds. It provided that the bond proceeds would be invested in an annuity that would be issued and managed by Wealth-Assurance. In addition, pursuant to a Placement Agency Agreement for the Tribal Bonds, Burnham Securities was entitled to a $250,000 fee from the bond sale proceeds. The agreement stated that notices to Burnham Securities should be sent to Jason Galanis (spelled "Galanos" in the agreement) and was signed by Dunkerley. Morton knew that Burnham Securities would be acting as the Placement Agent for the Tribal Bonds.

59. On August 17, 2014, Morton e-mailed Jason Galanis, acknowledging the conflicts of interest presented by her investment of client funds in a transaction in which affiliated companies – Wealth-Assurance and Burnham Securities – stood to benefit. She complained that she was spending much time performing due diligence regarding the Tribal Bonds "because of the multiple views I had to take." She explained: "For instance, since many of the accounts are ERISA funds, I had to consider those guidelines and regulations, I have a fiduciary duty to Burnham, and a fiduciary duty to the clients."

60. In another e-mail dated August 17, 2014, Morton sent Jason Galanis a memo articulating concerns regarding the Tribal Bonds. Among other things, Morton's memo questioned whether the tribe affiliated with the issuer—a tribal corporation operating in an impoverished region—would be legally or financially accountable for the Tribal Bonds and whether institutional clients would fire Hughes if they were dissatisfied with the investment.

19

61.     In her e-mail transmitting the memo to Jason Galanis, Morton wrote, in reference to BFG Investments' investment in Hughes: "The decision regarding what should be done is yours, not mine. . . To be fair to both of us, if you made the investment with this in mind, I do not have the moral right to stand in the way and everything is in place to move forward. . . ." She reiterated in a text message to Jason Galanis: "Let's be clear, if you want the bonds to go in, I have no say. I am not sitting in the position of making a judgement [sic]. If you invested in Hughes for this sole purpose than it is your call not mine. . . If you're thinking that I can or would stop this then I have totally screwed up my communication." Jason Galanis told Morton to let Hirst "make the decision."

62.     Between August 22 and 26, 2014, Hirst signed trade tickets purchasing $27,077,436 of Tribal Bonds on behalf of nine of Hughes' clients. The funds were sent to a trust account at US Bank for the benefit of WLCC. Neither Morton nor Hirst informed any of those clients about the investments beforehand. As one of the costs of issuance associated with the bonds, WLCC paid Burnham Securities a $250,000 placement agent fee out of the bond proceeds, of which $125,000 was then paid to Dunkerley as his share of the fee.

63.     Morton and Hirst knew that Morton's "financial sponsors," including Jason Galanis and Dunkerley, were associated with Wealth-Assurance and Burnham Securities, which had been described to her as the annuity provider and placement agent, respectively—entities that would financially benefit from Hughes' clients' purchases of the Tribal Bonds. Nevertheless, neither she nor Hirst disclosed to Hughes' clients that Hughes was investing their funds in investments that would financially benefit its undisclosed part owners and financiers.

64.     Upon learning of the investments in the bonds, several Hughes clients expressed concerns regarding the bonds' valuation and suitability and demanded that the investments be

unwound. Morton assured them that Burnham Securities, as the placement agent, had other clients interested in the bonds and was in the process of arranging purchases. However, despite repeated promises, Burnham Securities never produced buyers for the bonds, and none of Hughes' clients was able to liquidate its position in the bonds.

        2.    **AAM**

65.    In the fall of 2014, Jason Galanis began searching for additional investors to purchase another tranche of Tribal Bonds. Morton identified AAM, an investment manager with $11 billion in assets under management, as a potential target for Hughes.

66.    During the course of Morton's negotiations to acquire AAM, on October 30, 2014, Morton e-mailed Jason Galanis that she had had a conversation with AAM's Chief Strategist "about our SRI [Socially Responsible Investing]/Native American Initiative" and that "he is so on board with this." According to Morton, AAM's Chief Strategist told her that if she made him aware of the details of the bonds ahead of time, he would do his "damndest to get it placed within a day after the acquisition." Jason Galanis forwarded the e-mail to Cooney and Archer, with the note "working on more liquidity and sources for the various projects…see below. Promising." Cooney replied: "Very promising Greco!!"

67.    With the backing of Jason Galanis, Archer, Cooney and Dunkerley, Morton continued to negotiate with AAM. On December 1, 2014, at Jason Galanis's direction or with his knowledge, Dunkerley provided AAM's General Counsel a letter on behalf of the "Cor Group of Companies, Inc.," a CORFA affiliate, confirming its agreement to provide financing to capitalize the purchase of AAM. On February 2, 2015, Jason Galanis sent Archer and Cooney a "consultant report" directed to the "Board of Valorlife" regarding the financing of the proposed acquisition of AAM. Valorlife was a foreign insurer that Valor Group had acquired in November 2014.

68.     On April 2, 2015, at the direction of Jason Galanis, Valorlife financed the purchase of AAM through BFG Investments with an upfront capital contribution of $6,120,398. In addition to the upfront capital contribution, the purchase of AAM also included an agreement to make a deferred payment of $4,854,420, payable pursuant to two Reset Notes. The deferred payment was guaranteed by Valor Group and the guaranty was signed by Dunkerley as Valor Group's President.

69.     On March 30, 2015, Jason Galanis forwarded copies of the executed AAM acquisition documents to Cooney, Archer and Burnham Financial Group's President, and Cooney replied: "18 Balloons!!!  Fantastic J!!!"  The terms of the purchase were memorialized in an Amended and Restated Liability Company Agreement for GMT ("Restated Agreement"), entered into as of April 2, 2015.  Dunkerley signed the agreement on behalf of BFG Investments as its Managing Member.

70.     Pursuant to the Restated Agreement, AAM became GMT's wholly owned subsidiary.  The Restated Agreement provided that AAM's Board of Managers was to consist of four persons, comprised of two Class A Holders (Morton and her business partner) and two persons selected by BFG Investments as the Class B Holder.  Together, the Board of Managers was granted the exclusive right to control AAM.  In addition, GMT was required to appoint a CIO that was acceptable to BFG Investments.

71.     Immediately after the acquisition of AAM was completed, and in furtherance of his pledge to Archer and Cooney to obtain more "liquidity" for their "various projects," Jason Galanis instructed Morton to identify investors to purchase additional Tribal Bonds. By that point, Morton was aware that there was no active market for the bonds.  Since at least November 2014, she had been dealing with client complaints, including threatened litigation, regarding the

22

original bond investments by Hughes' clients and had been unsuccessful in her efforts to arrange for Burnham Securities to find buyers or purchase them itself. Indeed, in January 2015, she e-mailed Jason Galanis: "I thought that if necessary B[urnham] would bid on the bonds if the clients wished. It appears not to be the case. We have received one formal communication and I expect we will receive others in the coming days."

72.     As before, Morton learned that entities affiliated with her "financial sponsors," including Jason Galanis, Archer, Cooney and Dunkerley, would financially benefit from the sale of this tranche of Tribal Bonds. On April 9, 2015, Burnham Securities' counsel sent Morton a private placement memorandum for the new issuance of Tribal Bonds. Like the August 2014 Tribal Bonds issuance, it provided that the proceeds of the new issuance would be used for transaction costs, including a placement agent fee, and to purchase an annuity. It identified "Wealth Assurance Private Client Corporation, a subsidiary of Valor Group" as the underwriter and issuer of the annuity contract. It also disclosed that pursuant to a placement agreement entered into between the issuer, WLCC, and Burnham Securities, "Burnham Securities will receive an $80,000 fee from the Issuer for the sale of the Bonds by the Issuer."

73.     On April 10, 2015, Jason Galanis sent Morton a "Class A board member communication request," in which he demanded a conference call to discuss a number of business related items. In the e-mail, Jason Galanis expressed frustration regarding AAM's lack of support for a potential investment in additional Tribal Bonds: "On the Native American initiative, this was and has been a fundamental part of the business plan since we met. . . " and "[i]t is in everyone's interest to maintain their word." In the e-mail, Jason Galanis stated: "I am not a member of the board. However, I was responsible for arranging the financing for the company and have been requested to continue to be the lead in liaising with the investors."

74.     On April 14, 2015, Morton e-mailed Jason Galanis explaining that they "had a challenge regarding bond placement," and proposing that they could "mitigate the challenge of restrictive investment policies by going directly to our client base (which numbers over 40 clients) and introduce the concept. Exceptions to investment policies occur all of the time, the key is to have the relationship necessary and begin the discussions in advance of the placement." In the same e-mail, Morton also requested a $500,000 loan, explaining that AAM was suffering from financial difficulty and was struggling to pay its operating costs. Jason Galanis replied to Morton's message, "Let's talk, I don't like e-mail."

75.     The next day, Morton texted Jason Galanis: "I would really like to have clarity on the working capital as soon as possible. The trade will go through in the am." Jason Galanis replied: "Will wire 305 on Friday. Worst Monday." On April 16, 2015, Morton directed the investment of $16.2 million of an AAM client's funds in the new issuance of Tribal Bonds. One week later, AAM received a $305,000 payment, funded by bond proceeds from the WAPCC Account in Florida and authorized by Dunkerley at Jason Galanis's direction or with his knowledge.

76.     Morton arranged for AAM to use funds maintained in one of its managed funds (the "HY Fund") for the bond purchase. HY Fund implements a strategy of making diverse, high yielding, liquid investments through designated investment managers. HY Fund's only investor was Pension Fund 1, an existing client of AAM's for which AAM managed other investments in addition to its investment in the HY Fund.

77.     The purchase of the Tribal Bonds was inconsistent with HY Fund's investment strategy, and notwithstanding her previous e-mail to Jason Galanis suggesting that AAM

24

"introduce the concept" to Pension Fund 1 prior to making the investment, Morton did not discuss the purchase of the bonds with Pension Fund 1 prior to making the investment.

78.     After the purchase, on April 23, 2015, Morton informed Pension Fund 1 about the investment in the bonds and the fact that there was a potential conflict of interest because the individuals who controlled the annuity provider and the placement agent were also AAM's financiers. Morton did not tell Pension Fund 1 that those same individuals were also AAM's part-owners, and the largest source of AAM's capital. Nor did Morton disclose that Jason Galanis had promised her additional funding for AAM in connection with her approval of the bond purchase.

79.     The next day, Pension Fund 1's Executive Director informed AAM that it "strongly disagree[d]" with the purchase of the bonds and that Pension Fund 1 "should have been provided advance notice of this questionable purchase, particularly due to the fact that a conflict of interest exists in the purchase." Pension Fund 1 demanded that the bonds be liquidated immediately.

80.     Once again, Burnham Securities promised to find a purchaser for the bonds. However, neither Burnham Securities nor AAM was able to find any purchaser for the Tribal Bonds.

81.     Pension Fund 1 sent AAM a notice of redemption of all of its funds in HY Fund on September 24, 2015 and, on October 29, 2015, it notified AAM that it was redeeming the rest of its funds under AAM's management. Pension Fund 1 explained that its decision to end its relationship with AAM was based on Morton's "unilateral actions (which [were not yet] reversed) to violate investment guidelines and purchase inappropriate securities with the money contributed by the hard working members of [Pension Fund 1]."

82.     In October 2015, Dunkerley, on behalf of Burnham Securities, e-mailed AAM acknowledging the lack of a market for the bonds, and admitted that they could not even be priced: "You may want to refer to the risks section of the PPM where it clearly says there is 'no market for these and none is expected to develop in the future' . . . . This situation is clearly true at the moment and given the current investigation any price attributed to these bonds may not be appropriate for accounting or even misleading for any other purposes."

83.     At the time, Dunkerley knew that, contrary to the annuity contract he had signed, none of the bond proceeds had been sent to a separate account held by WAPCC BVI and managed by PEM, but, in accordance with the scheme, had instead been sent to the separately incorporated WAPCC in Florida and misappropriated from there.

### D. Jason Galanis, John Galanis, Dunkerley, Hirst, Archer and Cooney Misappropriate the Tribal Bond Proceeds.

84.     Based on the documents governing the sale of the $43.2 million in Tribal Bonds to Hughes and AAM clients, and after the deduction of various issuance costs and up-front payments to WLCC, $40.1 million of the bond proceeds were to be invested by PEM in annuities issued by WAPCC in BVI. The bonds issued to Hughes investors were to pay 5.62% interest annually and mature in 10 years; the bonds issued to AAM's HY Fund were to pay 6.02% interest annually and mature in 7 years. The payment of the interest and return of the full $43.2 million in principal upon maturity of all the bonds was dependent on the successful investment of the proceeds by WAPCC, under the direction of PEM.

85.     As set out in the two separate annuity contracts governing the bond issuances to Hughes and AAM clients (both signed by Dunkerley on WAPCC's behalf and Martin on PEM's behalf), WAPCC promised that the initial proceeds received would be kept in a "segregated asset account" that would be "unique to this Contract" and would be "segregated from the Company's

other assets." The annuity contract governing the Hughes clients' bond proceeds also explicitly provided that the annuity purchase payment was to be made by wire transfer to "a bank without any offices and/or branches in the United States" (a provision that was apparently edited out of the subsequent annuity contract used for the bond issuance sold to the HY Fund).

86.     As described above, instead, all of the bond proceeds were sent to the WAPCC Account in Florida, held in the name of an identically named entity (WAPCC) incorporated and based in Florida rather than in the BVI, and were never managed by PEM or Martin, in a separate account or otherwise.

87.     In furtherance of the scheme, with Jason Galanis's knowledge, Dunkerley misappropriated the Tribal Bond proceeds from the WAPCC Account by authorizing wires to a number of other entities, at least on some occasions doing so based on written instructions he received from Jason Galanis. For his part, Martin was compensated for his role in funneling the proceeds to WAPCC through the annuity contract by payments from Galanis-controlled accounts.

88.     Dunkerley wired the largest portion of the proceeds to Thorsdale, an entity Jason Galanis controlled, from which they were further misappropriated by Jason Galanis for his own benefit and that of his associates. According to its operating agreement, Thorsdale was incorporated in Nevada as a "Family Trust Company" for "members of the Berger family and its Family Affiliates." Berger is the maiden name of Jason Galanis's wife. Jason Galanis had signing authority over Thorsdale's bank account, held its only debit card, and directed all the wires that Thorsdale sent that were funded by bond proceeds from the WAPCC Account.

89.     The misappropriation of Tribal Bond proceeds by WAPCC and Thorsdale included the following:

### 1.   Payments to Hughes and AAM

90.     Morton's decisions to invest Hughes' and AAM's clients' funds in the Tribal
Bonds were driven in part by her expectation that Jason Galanis would continue to arrange
financial backing for the firms.  Not only were her expectations met, but they were met by
Hughes' and AAM's receipt of a portion of the very proceeds that WAPCC was supposed to be
investing on behalf of the bond issuer and for the ultimate benefit of Morton's clients.

91.     At the direction of Jason Galanis, Hughes and AAM received at least $655,000 of
Tribal Bond proceeds:  1) a $350,000 payment on September 8, 2014, that Jason Galanis had
Dunkerley wire from WAPCC to Thorsdale and then to Valor Group, which then wired it to
Hughes; and 2) a $305,000 payment (matching the amount that Jason Galanis had expressly
promised to Morton the day before she effected the April 2015 bond purchase by the HY Fund)
that Dunkerley wired to AAM directly from the WAPCC Account on April 23, 2015.

### 2.   $2,350,000 to John Galanis

92.     The closing documents for the sale of the first issuance of Tribal Bonds in August
2014 did not reflect any payments to John Galanis for the work he did in presenting the
transaction to WLCC and securing its participation as issuer.  Nor was WLCC informed by John
Galanis, or anyone else, that John Galanis would earn any fees in connection with the Tribal
Bonds, although John Galanis knew that proceeds from the issuance would be directed to him by
his son.

93.     Yet, after WAPCC received the bond proceeds in August 2014, all of which it had
received as purchase money for the bogus annuity contract it signed, at Jason Galanis's direction,
Dunkerley sent $2.35 million from WAPCC to an entity controlled by John Galanis called

28

Sovereign Nations Development Corp. From Sovereign Nations Development Corp's bank account, John Galanis directed several further distributions to another account in his name.

### 3. Jason Galanis and Dunkerley Misappropriate Millions to Benefit Jason Galanis, Dunkerley, Hirst, Cooney, Archer and Martin.

94.     Jason Galanis arranged to have WAPCC and Thorsdale transfer over $3 million to lenders and others for the mortgage on and maintenance of his estate in Los Angeles, California. He also arranged to have money wired from WAPCC and Thorsdale to his criminal defense attorneys ($497,210) and to his mother, wife and father-in-law (totaling $214,000).

95.     In addition, Jason Galanis used his Thorsdale debit card to spend thousands more at restaurants and luxury retailers such as Valentino, Yves Saint Laurent, Barneys, Prada and Gucci.

96.     Dunkerley, Hirst, Cooney, Archer and Martin  all benefited from their participation in the scheme as well through transfers directed by Jason Galanis out of the Thorsdale account that they received individually or through entities that they controlled, including but not limited to:  a) $700,513 to Archer between November 2014 and April 2015; b) $4,370,000 to Cooney between August 2014 and April 2015; c) $20,485 to Dunkerley in September 2014; d) $1,300,000 to Hirst in August 2014; and e) $165,000 to Martin between September 2014 and May 2015.

### 4. Jason Galanis, Archer and Cooney Recycle Tribal Bond Proceeds to Acquire New Tribal Bonds for Burnham's Use.

97.     In August 2014, the Independent Trustees of an asset manager affiliated with Burnham Securities sought "iron-clad assurance(s)" from Archer (representing CORFA and BAM Holdings, LLC) that Jason Galanis would "not be involved with any of the Burnham entities" or have an "interest of any kind, direct or indirect, in any of the Burnham entities or

their successors, that he will not source deals to the Burnham entities and that the Burnham entities will not invest with or in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association, affiliation or investment, pecuniary or otherwise, directly or indirectly." Archer provided the requested assurances to the Independent Trustees via a letter dated September 26, 2014, but nonetheless continued to significantly involve Jason Galanis in Burnham's business activities, not only by allowing Jason Galanis to solicit Burnham Securities' involvement as the private placement agent for the Tribal Bonds and underwriter for at least one initial public offering, as described below, but also by accepting his direction and guidance on how to use the Tribal Bonds to benefit Burnham Securities and its affiliates.

98.     On October 1, 2014, Jason Galanis used $15 million of the $27 million that Hughes' clients invested in the August 2014 issuance of the Tribal Bonds to fund the acquisition of a new $15 million issuance of Tribal Bonds by RSB, an entity wholly owned by Archer. In other words, instead of having WAPCC invest the first bond issuance's proceeds in an annuity and assure repayment of the bonds' principal and interest, Jason Galanis used $15 million of those proceeds to invest in more Tribal Bonds, causing WLCC to issue $15 million more in obligations even though it was not, in actuality, receiving any additional proceeds to fund an annuity that would be the only source for repayment of the bonds. The point of this recycling scheme was to allow Jason Galanis to use the bonds as currency in various transactions, including to bolster Burnham Securities' net capital.

99.     To coordinate Archer's purchase of the $15 million Tribal Bonds, Jason Galanis arranged for $15 million to be sent from Thorsdale to RSB. RSB then wired $15 million to the indenture trustee for the benefit of WLCC to purchase the newly issued Tribal Bonds. Most of the funds received in this issuance were sent again to WAPCC as purchase money supposedly

for a new annuity. Prior to receiving these funds, RSB's account balance was about $2 million. In the course of paying for the Tribal Bonds, Archer's bank asked him to identify the source of the funds. Archer facilitated the recycling of the bond proceeds by telling his bank in a client representation letter he signed on October 20, 2014: "The funds used to purchase the bonds were from real estate sales through my business, Rosemont Seneca Bohai LLC," a statement Archer knew was untrue when he made it.

100.    Jason Galanis then recycled a portion of the funds again, this time to fund the acquisition of a new $5 million issuance of Tribal Bonds by Cooney. Between October 2 and 6, 2014, Dunkerley, at Jason Galanis's direction or with his knowledge, sent back to Thorsdale a large portion of the funds WAPCC had received from WLCC in connection with the $15 million sale of Tribal Bonds to RSB. On October 8, 2014, Jason Galanis sent $5 million of the money that Thorsdale received to Cooney, who used it to purchase Tribal Bonds. By twice recycling a portion of the proceeds from the initial bond issuance, Jason Galanis and his cohorts caused WLCC to issue $47 million of Tribal Bonds in exchange for $27 million (minus transaction-related fees) in proceeds.

101.    Archer and Cooney then used their illegitimate Tribal Bonds to benefit Burnham Securities, an entity in which they each held an ownership interest. In April 2015, Archer used RSB's Tribal Bonds to purchase shares of Valor Group with Dunkerley signing the documents on Valor Group's behalf. In May 2015, one of Valor Group's wholly-owned subsidiaries transferred $2.6 million of the Tribal Bonds to Burnham Securities to boost its net capital in order to meet regulatory requirements.

102.    Similarly, in May 2015, Cooney transferred his $5 million Tribal Bonds to Burnham Securities in a transaction devised by Jason Galanis "to get Cooney some reliable

income while getting Burnham Net Cap it can commercialize." In an e-mail dated April 24, 2015, to Cooney, Archer and Burnham Financial Group's President, Jason Galanis instructed them: "if we hustle, we can get the $5 mm on to Burnham's balance sheet this month. This would require Bevan [Cooney] getting the physical bond delivered to US Bank for transfer into Burnham's name."

103.    Eventually, on May 29, 2015, Cooney directly transferred the $5 million Tribal Bonds, on Burnham Securities' behalf, to Broker Dealer 1 in partial consideration of Burnham Securities' purchase of an interest in Broker Dealer 1. Cooney received nothing in exchange from Burnham Securities for transferring the Tribal Bonds to Broker Dealer 1 on Burnham Securities' behalf, and no documents evidence the contribution by Cooney as either an investment in or loan to Burnham Securities. In response to inquiries from FINRA regarding the specifics of the bonds and Cooney's contribution of them, Jason Galanis told Broker Dealer 1's President to tell FINRA that Cooney had been an investor in Burnham Securities since 2013 and "agreed to make a follow-on investment in 2015 in support of Burnham's business plan to diversify."

    **5.    Jason Galanis, Hirst, Dunkerley and Martin Use Tribal Bond
    Proceeds to Support an IPO Underwritten by Burnham.**

104.    At the direction of Jason Galanis and Hirst, WAPCC used a significant portion of the proceeds from the sale of the April 2015 Tribal Bonds to support the successful initial public offering of Technology Company, in which Jason Galanis, Hirst, Archer, Cooney and Dunkerley all held shares, and for which Jason Galanis served as an "advisor."

105.    In February 2014, Jason Galanis sent Dunkerley the first draft of an S-1 for Technology Company in connection with a potential discussion regarding "Burnham West handling the IPO" but asked him to "not distribute to Burnham colleagues until later drafts."

Jason Galanis also told Dunkerley that "Burnham will not be expected to raise any real money, rather will act as an IPO sponsor." Jason Galanis forwarded the e-mail to Archer and Cooney to include them in his plans.

106.    In May 2015, Jason Galanis, Hirst and Martin coordinated the success of Technology Company's IPO, which was underwritten by Burnham Securities, with Dunkerley taking a lead on the deal. Technology Company's stock was initially offered on the NASDAQ on May 19, 2015 at $5/share.

107.    Between April 29th and May 18th, 2015, Dunkerley, acting at Jason Galanis's direction or with his knowledge, authorized wires totaling $4,336,000 from the WAPCC Account to two brokerage accounts at Burnham Securities, in the names of IPO Participant 1 and IPO Participant 2. Both accounts were opened and controlled by Martin, at the direction of Hirst. Martin knew, or was reckless in not knowing, that the source of the funds for the IPO Participant 1 and IPO Participant 2 accounts came from the very proceeds he was supposed to be managing as an independent Investment Manager and under the terms of the Investment Management Agreement and Annuity Contract he signed. Under his Investment Management Agreement, Martin was instructed to purchase a variable annuity "which will provide for sufficient cash flow to serve [WLCC's] debt" under the Tribal Bonds, not facilitate the movement of the proceeds into accounts used to buy speculative IPO securities by Hirst or his entities.

108.    IPO Participant 1 and IPO Participant 2, acting through Martin in the Burnham Securities accounts he had opened, used $4,335,000 of the funds that they received from WAPCC to purchase 867,000 shares of Technology Company during the IPO. The shares purchased by Martin in the IPO Participant 1 and IPO Participant 2 accounts represented 87% of

the shares offered during Technology Company's IPO. The remaining 13% was also sold to friendly accounts, including accounts controlled by Hirst.

109.    Martin liquidated at least a portion of the Technology Company shares in the IPO Participant 1 and IPO Participant 2 accounts immediately on the open market at prices ranging from $14 to $36 per share, above the IPO purchase price of $5 per share. As of October 15, 2015, Martin liquidated 324,120 shares of Technology Company held in the IPO Participant 1 and IPO Participant 2 accounts for proceeds of $4,523,312.

110.    Despite Martin's profitable trading in the IPO Participant 1 and IPO Participant 2 accounts with money furnished by WAPCC, he knowingly or recklessly disregarded his duties to WLCC as its independent Investment Manager by failing to direct the full $4.3 million back to WAPCC. Instead, Martin sent millions of dollars from the IPO Participant 1 and IPO Participant 2 accounts to a variety of Galanis-related transferees, including Jason Galanis's criminal defense attorneys, Burnham Financial Group and RSB. Martin, himself, also received $145,000 from IPO Participant 1 and IPO Participant 2.

### E.  In September 2015, Jason Galanis and Hirst Were Charged and Arrested in a Separate Matter.

111.    In September 2015, the Commission charged Hirst, John Galanis, Jason Galanis, and two of Jason Galanis's brothers, with defrauding investors in Gerova, whose shares once traded on the New York Stock Exchange. The USAO filed parallel criminal charges.

112.    As a condition of his release on bail pending the resolution of the criminal charges against him in US v. Galanis, Jason Galanis was required to disclose whether he served as an officer, director, consultant, advisor or investment banker as to any company. To evade detection by law enforcement authorities of Jason Galanis's ongoing activities with respect to Burnham Securities, GMT and WAPCC, Martin created a new internet domain,

34

colarisventures.com, along with the e-mail address, legal@colarisventures.com, immediately after Jason Galanis's arrest.  Martin agreed to do so even though he knew, or was reckless in not knowing, that Jason Galanis wanted to set up that separate domain and email address to disguise his ongoing fraudulent conduct.  Using this new e-mail address, and while still released on bail, Jason Galanis continued to correspond with Dunkerley, Archer, Cooney and others, going so far as to dictate correspondence Dunkerley should send to third-parties.  And he continued to direct business decisions and transactions, including coordinating an interest payment due on the Tribal Bonds, as described in the section below.

### F.  The Aftermath:  Jason Galanis, Archer and Dunkerley Continue to Mislead WLCC and Scramble to Fund WAPCC's Interest Payment Obligations under the Annuity Contracts

113.    Pursuant to the annuity contracts in connection with the August and September 2014 issuances of Tribal Bonds, WAPCC was obligated to make respective interest payments in September 2015 and in October 2015.  Since WAPCC had misappropriated the proceeds from the Tribal Bonds instead of investing them in annuities, separately managed by PEM and Martin, Jason Galanis scrambled to ensure that WAPCC had sufficient funds from other sources to pay the interest payments that were due in order to protect the Tribal Bond scheme from exposure, calling on associates for contributions as needed.

114.    In September 2015, Dunkerley authorized WAPCC to forward $1.5 million to the indenture trustee as interest due on the August 2014 bonds.  That amount covered the interest payments due to investors, but failed to cover an additional $277,182.87 in annual income that WAPCC was obligated to pay WLCC.  Based on the sources of funds held in WAPCC's bank account at the time, the $1.5 million payment that it did make was funded by a small portion of Technology Company stock sale proceeds it received from IPO Participant 1 and IPO Participant

35

2 ($1.3 million), amounts contributed by Archer ($250,000), and/or amounts received from another associate of Jason Galanis ($250,000).

115.     After he had been arrested, using his new legal@colarisventures.com e-mail address, Jason Galanis orchestrated the $1,197,311 interest payment due on the October 2014 Tribal Bonds – bonds that Archer and Cooney had "bought" using recycled proceeds from the first Tribal Bond issuance, and at least a portion of which Burnham Securities now held after they had been contributed by Valor Group's subsidiary in May 2015.  First, on September 30, 2015, Jason Galanis instructed Dunkerley to tell Burnham Financial Group's President to have Burnham Financial Group wire $903,000 to the indenture trustee on behalf of WLCC.  That same day, in order to make that payment, Burnham Financial Group received the necessary funds from a wholly-owned subsidiary of Valor Group in a transaction Archer coordinated.  The next day, RSB sent Burnham Financial Group an additional $1,098,000, a portion of which Burnham Financial Group used to send an additional $294,311.11 interest payment to the indenture trustee.  In other words, Burnham Financial Group (through funds provided by Valor Group's subsidiary and RSB) ended up paying for the interest on the Tribal Bonds that it controlled.  But as with the August 2014 Tribal Bonds, WAPCC failed to make the additional income payment ($250,000) due to WLCC under the annuity contract.

116.     On October 8, 2015, WLCC sent Dunkerley a letter expressing concern regarding information it had recently learned about Burnham Securities and the ongoing difficulty it was experiencing in receiving funds due it under the Annuity contracts.  In the letter, WLCC requested that Dunkerley immediately provide valuations on all three annuity contracts.

117.     On October 15, 2015, at Jason Galanis's direction or with his knowledge, Dunkerley responded to WLCC's letter and attached fabricated annual account statements on

36

WAPCC letterhead (reflecting an address in the BVI) for the annuity contracts Martin had purportedly purchased in connection with the August 2014 and September 2014 Tribal Bonds. On November 5, 2015, also at Jason Galanis's direction or with his knowledge, Dunkerley provided a similar fabricated annual account statement for the annuity contract Martin purportedly purchased in connection with the April 2015 Tribal Bonds. None of the statements contained any information regarding the underlying investments and each indicated that the value of the accounts had not changed one penny from the initial amount of money that had purportedly been invested in the annuities.

118.    On February 17, 2016, after the Commission filed its complaint in SEC v. AAM, Jason Galanis sent WLCC a letter to rebut the Commission's allegations and to assure WLCC of the Tribal Bonds' validity and WAPCC's appropriate investment of the bonds' proceeds. In the letter, Jason Galanis pointed to the timely payment of interest on the bonds as evidence of their legitimacy, noting, "WLCC bond interest of over $2.72 million was already paid by these distributions precisely as contemplated in the Indenture and related agreement," and falsely stated: "These annuity distributions will continue from the assets owned in the annuities. Therefore, the WLCC bonds will continue to be paid." Among other things, Jason Galanis concealed the fact that the two interest payments had been funded by sources other than annuity investments.

119.    More recently, and with an interest payment due date for the April 2015 bond issuance fast approaching, Jason Galanis changed tacks. In an April 4, 2016 letter to WLCC, Dunkerley, writing on behalf of WAPCC, declared that WAPCC had suspended its interest payments on the Tribal Bonds. In his letter, written at the direction or with the knowledge of Jason Galanis, Dunkerley notified WLCC that WAPCC would "withhold Annuity distribution

payment to WLCC until such time as WLCC provides a satisfactory financial surety" to indemnify WAPCC for the costs it and its "agents" incurred in defense of the Commission's investigation, among other matters.

### G. The Commission's Action Against AAM

120.    On December 15, 2015, the Commission filed an emergency action charging AAM with investment adviser fraud for investing over $43 million in Tribal Bonds without disclosing the conflicts of interest inherent in the transactions arising from the benefits the bond sales generated for entities related to AAM's parent company and financiers.  The Commission obtained a TRO appointing a monitor to oversee AAM, in order to protect AAM's clients from further inappropriate investments.

121.    On January 8, 2016, based on concerns identified by the Court-appointed monitor, the Commission obtained an order expanding the monitor's powers to that of a receiver.  The receiver is in the process of winding down the company.  By consent of the receiver, the Commission has obtained a bifurcated judgment as to liability against AAM.

### FIRST CLAIM FOR RELIEF
#### Violations of and Aiding and Abetting Violations of Section 17(a)(I) and (3) of the Securities Act
(Against Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin)

122.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 121.

123.    Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin each, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails in the offer or sale of securities, with scienter, employed devices, schemes or artifices to defraud or engaged in

transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

124.    By virtue of the foregoing, Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin each, directly or indirectly, violated, and unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

125.    In the alternative, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin each, directly or indirectly, knowingly or recklessly provided substantial assistance to Jason Galanis, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, with scienter, used the means or instruments of transportation or communication in interstate commerce or used the mails to employ devices, schemes or artifices to defraud or to engage in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

126.    By virtue of the foregoing, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

### SECOND CLAIM FOR RELIEF
### Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b) and (c) Thereunder
### (Against Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst, Morton and Martin)

127.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 121.

128.    Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst, Morton and Martin each directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

129.    By virtue of the foregoing, Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst, Morton and Martin each violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R.§§ 240.10b-5(a) and (c)].

130.    Morton directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

131.    By virtue of the foregoing, Morton violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

132.    In the alternative, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin each directly or indirectly, provided knowing and substantial assistance to Jason Galanis, who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to

40

defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

133.    By virtue of the foregoing, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin each aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c) ] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8**
**thereunder**
**(Against Morton)**

134.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 121.

135.    Morton, while acting as an investment adviser, by use of the mails, or the means and instrumentalities of interstate commerce, directly or indirectly, singly or in concert with others: (a) employed devices, schemes, or artifices to defraud her clients or prospective clients with scienter; and (b) knowingly, recklessly or negligently engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon her clients or prospective clients.

136.    Morton, while acting as an investment adviser to a pooled investment vehicle, (a) made untrue statements of material fact or omitted to state a material fact, necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to an investor in the pooled investment vehicle; and (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

41

137.     By virtue of the foregoing, Morton violated, and unless restrained and enjoined, will continue violating, Sections 206(1), (2) and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
### (Against Morton)

138.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 121.

139.     Morton, directly or indirectly, knowingly or recklessly provided substantial assistance to Hughes and AAM, which, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, singly or in concert with others: (a) employed devices, schemes, or artifices to defraud their respective clients or prospective clients with scienter; and (b) knowingly, recklessly or negligently engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon their respective clients or prospective clients.

140.     Morton, directly or indirectly, knowingly or recklessly provided substantial assistance to AAM which, while acting as an investment adviser to a pooled investment vehicle, (a) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of circumstances under which they were made, not misleading, to an investor in the pooled investment vehicle; and (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

141.     By virtue of the foregoing, Morton aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Sections 206(1), (2) and (4) of the

42

Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], in violation of Section 209(f) of the Advisers Act [15 U.S.C . § 80b-9(f)].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 17(a)(1) and (3) of the Securities Act [15 U.S .C. §§ 77q(a)(l) and (3)];

### II.

Permanently restraining and enjoining Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R.§§ 240.10b-5(a) and (c)];

### III.

Permanently restraining and enjoining Morton, her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b) and

(c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)] and Sections 206(1), (2) and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## IV.

Permanently barring Jason Galanis, Archer and Dunkerley from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and permanently barring Morton from acting as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## V.

Directing each of the Defendants to disgorge all ill-gotten gains, plus prejudgment interest thereon;

## VI.

Directing Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst and Martin to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

## VII.

Directing Jason Galanis, Archer, Cooney, Dunkerley, John Galanis, Hirst, Morton and Martin to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## VIII.

Directing Morton to pay civil money penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## IX.

Granting such other and further relief as this Court deems just and appropriate.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York
November 14, 2016

By: _____

Andrew M. Calamari
Sanjay Wadhwa
Adam S. Grace
Nancy A. Brown
Tejal D. Shah
H. Gregory Baker
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
   COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: brownN@sec.gov